UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ALICE M. JOHNSEN,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )   Case No. 4:11CV927 FRB
                                     )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,                  )
                                     )
            Defendant.               )

                    **MEMORANDUM AND ORDER**

      This matter is on appeal from an adverse ruling by the
Commissioner of Social Security.  All matters are pending before
the undersigned United States Magistrate Judge, with consent of the
parties, pursuant to 28 U.S.C. § 636(c).

              **I.      Procedural Background**

      Plaintiff Alice M. Johnsen ("plaintiff") applied for
Supplemental Security Income ("SSI") under Title XVI of the Social
Security Act ("Act") and for Disability Insurance Benefits ("DIB")
under Title II of the Act, alleging that she became unable to work
due to disability on September 1, 2006.  (Tr. 114-125).  Plaintiff
alleged that she was disabled due to attention deficit
hyperactivity disorder ("ADHD"), attention deficit disorder
("ADD"), and depression.  (Tr. 236).  In her application for SSI,
plaintiff averred that she was not disabled prior to age 22.  (Tr.
122).

      Plaintiff's applications were denied initially and upon

-1-

reconsideration, and she requested a hearing before an
administrative law judge ("ALJ") which was held on December 1,
2009. (Tr. 23-50).  On January 26, 2010, the ALJ issued a decision
in which he determined that plaintiff was not disabled under the
Act. (Tr. 10-22).  Plaintiff sought review from defendant agency's
Appeals Council, which granted plaintiff's request for review on
February 18, 2011.  (Tr. 57-60).  On April 7, 2011, the Appeals
Council issued an unfavorable decision, finding that plaintiff was
not disabled under the Act.  (Tr. 1-8).  The Appeals Council's
decision thus stands as the Commissioner's final decision subject
to review by this Court under 42 U.S.C. § 405(g).  See Sims v.
Apfel, 530 U.S. 103, 106-107 (2000) (if the Appeals Council grants
review of a claim, then the decision that the Council issues is the
Commissioner's final decision).

## II.    Evidence Before The Commissioner

### A.   Plaintiff's Testimony

During the administrative hearing before the ALJ,
plaintiff, age 28, testified that she had left school in the
eleventh grade, that she was married, and that she had a young
daughter. (Tr. 27-29).  She testified that she and her husband and
daughter lived with her husband's parents, both of whom were
disabled. (Tr. 34).  She testified that she stopped trying to get
her G.E.D. due to frustration. (Tr. 29-30).  She testified that
her husband had been employed as a newspaper delivery person, but
quit that job because the delivery route was "too hard on the van"
inasmuch as he was required to drive many miles on dirt roads and

-2-

city streets, and also because gas was expensive.  (Tr. 37-38).
Plaintiff testified that she received food stamps.  (Tr. 28-29).
She did not have a driver's license because she failed the written
license examination on two occasions.  (Tr. 29).

Plaintiff earned grades of A and B in middle school, but
her grades were slightly poorer in high school.  (Tr. 30).
Plaintiff testified that she could read, write, add and subtract.
(Tr. 31).  She testified that she became frustrated while trying to
make dinner, and that her mother-in-law helped her.  (Id.)  When
asked to explain why she became frustrated while trying to make
dinner, plaintiff explained that she became frustrated if she
spilled things or if grease spattered on her.  (Tr. 32).  She
testified that she could cook lunch, and could cook things like
rice or macaroni and cheese without becoming frustrated.  (Id.)
She was able to do laundry without becoming frustrated.  (Tr. 33).
She testified that she became sidetracked while trying to do
household chores and needed reminders.  (Tr. 33-34).

Plaintiff testified that she had not worked much because
she was too easily sidetracked, and needed to have someone with her
to keep her on task.  (Tr. 34-35).  After leaving high school,
plaintiff worked as an in-home housekeeper; at South County Nursing
Home as a certified nurse's assistant (also "CNA"); and at
Silverleaf Club as a housekeeper.  (Tr. 35-36).

Plaintiff testified that she used to use marijuana "every
once in a while" but had not used it since she was married in May
of 2006.  (Tr. 36).  She testified that she had not had any

-3-

medication prescribed for her in "quite some time." (Tr. 37).

Plaintiff then testified regarding her physical capabilities. She testified that she could run or jump for a little while, and could lift and carry 20 pounds once or twice per day. (Tr. 39). She stated that she could push and pull a grocery cart, could balance and climb, and could bend over for a short while. (Tr. 39-40). She denied problems with kneeling, crawling, seeing, hearing, and speaking. (Tr. 40). Plaintiff testified that she had trouble with her memory and could not remember "two weeks ago." (Id.) She stated that she became a little upset when she heard bad news. (Id.) She testified that she became sidetracked at work and needed someone to help her. (Tr. 40-41). Plaintiff testified that she had Attention Deficit Disorder and could not keep her mind on what she was trying to do. (Tr. 43). She stated that she was depressed every day; that her depression lasted all day; and that she had received mental health treatment at a clinic in Ava, Missouri. (Tr. 41, 43). Plaintiff testified that she experienced mood swings and "bad nerves." (Tr. 44).

When asked to describe a normal day, plaintiff testified that she rose at 7:30 with her daughter, made breakfast, watched cartoons with her daughter, performed "a little light cleaning on the side with a little help," made her daughter's lunch, put her daughter down for a nap, did laundry, made dinner, played with her daughter, and put her to bed at 9:30. (Id.) Plaintiff testified that she had to take breaks during the day because she was "hurting so bad" and that she had trouble falling asleep due to pain. (Tr.

-4-

41-42).  She stated that she had pain in her "back all the way up
my back, in my knees" that she rated at a seven on a scale of one
to ten.  (Tr. 42).  She stated she did not take any medications to
help the pain because she "didn't want it."  (Id.)  Plaintiff
testified that she smoked cigarettes, and that she drank alcohol
occasionally but never used illegal drugs.  (Id.)

        Plaintiff  then  responded  to  questions  from  the  ALJ.
Plaintiff  initially  denied  that  she  had  used  cocaine,  but  when  the
ALJ  noted  that  plaintiff  had  reported  using  cocaine  and
methamphetamine, plaintiff testified that she had tried cocaine and
methamphetamine  one  time  but  not  again.   (Tr.  45).   Plaintiff
testified  that  she  was  not  taking  any  medications  with  the
exception  of  two  aspirin  every  other  day  to  dull  the  pain  in  her
back.  (Tr. 45-46).  She testified that she did not take Tylenol or
Advil because she heard they caused liver damage.  (Tr. 46).  She
used no other treatment for her back pain.  (Tr. 47).

        The ALJ then heard testimony from the vocational expert
(also "VE").  The ALJ asked the VE to consider an individual of
plaintiff's  age,  education,  and  experience,  who  had  physical
restrictions  and  could  perform  simple,  unskilled  to  low  semi-
skilled activities; could understand, follow and remember concrete
instructions;  have  superficial  contact  with  co-workers  and  the
public; and who could meet, greet, make change, and give simple
instructions and directions.  (Tr. 48).  The VE testified that such
an  individual  could  perform  the  duties  of  hand  packager,  and
cleaner, housekeeping.  (Tr. 48-49).  The VE testified that these

jobs had Specific Vocational Preparation ("SVP")[1] levels of two, which corresponded to the fourth through the sixth grade. (Tr. 49).

The ALJ then asked whether there were any jobs that could be performed by such an individual whose poor attention span rendered her unreliable for an eight-hour day or a 40-hour week on a regular and consistent basis, and the VE testified that there were no jobs that such an individual could perform. (Id.)

   B.   Medical and Other Evidence

The administrative record includes school records from Vineland Elementary School in De Soto, Missouri. (Tr. 133-209). Plaintiff was enrolled in special education programs beginning in kindergarten. (Id.) It is indicated that an Individualized Educational Program (also "IEP") was implemented for plaintiff when she was six and one-half years of age. (Tr. 133). It is noted that plaintiff had delays in expressive and receptive language development and difficulty following directions, and she appeared frustrated. (Tr. 134). When plaintiff was eleven years of age, her school noted that she had matured, but had some attitude problems that affected the quality of her work. (Tr. 150). It was noted that she had made good progress in reading, and that her math skills were at a second-grade level. (Id.) In plaintiff's sixth grade year, her school reported that she exhibited disrespectful

_____

[1]"SVP" refers to the amount of time it generally takes to learn a job. See United States Dep't of Labor, Employment and Training Admin., Dictionary of Occupational Titles ("DOT"), Vol. II, Appendix C at 1009.

behavior in class, and had mood swings and temper outbursts. (Tr. 158). It was noted that she was performing reading and math at a third grade level. (Id.) During plaintiff's seventh grade year, her school noted that she fell in the low range of intelligence according to the results of the Wechsler Intelligence Scale for Children ("WISC-III") test. (Tr. 174). She was reading without difficulty at the fourth grade level, but had poor math skills and a bad attitude towards school work and did "not seem to care if she does an assignment or not." (Id.)

Plaintiff's school records indicate that plaintiff's eighth grade year was a very positive one; that plaintiff seemed happier and was completing her work; and that she was doing "quite well" in multiplication and division. (Tr. 181). In her tenth grade year, she was working in the school cafeteria and was keeping up her classes. (Tr. 193). It was noted that her full-scale I.Q. was 68, and that she performed significantly better on nonverbal than on verbal reasoning tasks. (Id.) She was noted to be easily frustrated with people who disagreed with her or made negative comments to her. (Id.) Increasing career awareness was listed as an annual goal. (Tr. 193-94). In her eleventh grade year, it was noted that her full-scale I.Q. was 68, but that she was mainstreamed into a regular math class, family and consumer science, and an art class. (Tr. 204). It is noted that plaintiff had not expressed a career direction, but would have the opportunity to meet with a vocational rehabilitation representative and go through career interest and aptitude testing. (Id.) It was

noted that plaintiff worked best in a structured setting with few distractions, and that she was easily frustrated and needed encouragement to continue working. (Id.) Long-term goals for plaintiff were noted as choosing a career direction, and taking the necessary steps for job training. (Id.) In ninth grade, plaintiff earned grades of B- in math and science; B+ in social studies, B in English, and C in physical education and reading. (Tr. 213).

On October 15, 1996, Ms. Nadine Sebastian, plaintiff's classroom teacher, completed a Diagnostic Summary. (Tr. 215-18). Ms. Sebastian noted that plaintiff had suffered complications during birth. (Tr. 215). Ms. Sebastian noted that plaintiff's cognitive ability was within the intellectually deficient range, and that plaintiff performed better on nonverbal than verbal reasoning. (Tr. 216). Ms. Sebastian concluded that plaintiff met the eligibility criteria to be classified as mildly mentally handicapped. (Tr. 217).

In a Disability Report, plaintiff wrote that she suffered from ADHD, AADD, and depression. (Tr. 236). She explained that she had difficulty getting along with others, was easily confused and frustrated, had trouble reading due to dyslexia, and was experiencing headaches. (Id.) She wrote that she stopped working on September 1, 2006 "due to [her] pregnancy." (Id.) Plaintiff wrote that she had worked as a housekeeper/attendant for a disability resource program for approximately one year. (Tr. 237). She wrote that, in this job, she cleaned a woman's home, dusted, mopped, cooked for her, helped her dress, and cleaned her bathroom.

(Id.)

Medical records from Missouri Ozarks Community Health
(also "Community Health") indicate that plaintiff was seen by S.
Pogue, M.D., on June 13, 2006 with complaints of chronic back pain.
(Tr. 303).   Upon examination, it was noted that plaintiff was
"moaning and groaning a lot and taking short hyperventalatory
breaths," but that she did "not moan and groan much when she thinks
I am not there to listen." (Tr. 304).  Plaintiff had a normal gait
with no spinal tenderness.  (Id.)  She was given a muscle relaxant
and instructed to return in two weeks if there was no improvement.
(Id.)

On December 21, 2006, plaintiff returned to Community
Health with complaints of bilateral earache, migraine headache, and
pain with swallowing.   (Tr. 305).   She reported that she was
pregnant. (Id.)  She was diagnosed with tonsillitis and given an
antibiotic.   (Id.)   Plaintiff returned on March 8, 2007 with
complaints of a sore throat, runny nose, migraine, nausea, fatigue,
weakness, and ear pain. (Tr. 306).  She was seven months pregnant.
(Id.)  She was diagnosed with sinusitis and given an antibiotic.
(Id.)  On April 2, 2007, plaintiff returned to Community Health for
reasons unrelated to the case at bar.  (Tr. 307).   She did not
complain of back pain.  See (Id.)

On June 5, 2007, plaintiff returned to Community Health
and complained of post-partum depression, stating that she was
experiencing mood changes and increased appetite.  (Tr. 308).  She
reported that her baby was born eight weeks premature, and that she

-9-

was under a lot of stress because she was traveling from her home to the hospital to see the baby. (Id.) She was referred for counseling. (Id.) She returned on July 11, 2007 with complaints of severe bladder pain and trouble with urination. (Tr. 309). She reported that she had a lot of pain with her menstrual period, and was starting her period at that time. (Id.) She returned on August 2, 2007 with complaints of mood swings and depression, and stated that she had bitten her husband the preceding night "during a fit." (Tr. 312). Physical examination was normal, and plaintiff was noted to have a normal gait, balance and coordination, and to move all of her extremities without difficulty. (Id.) She was given Prozac.[2] (Id.) Plaintiff returned on August 15, 2007 for follow up on medications. (Tr. 313). She reported pain in her ears and throat, cough, congestion, and hoarseness. (Id.) She was diagnosed with depression and middle ear fluid. (Id.)

On October 15, 2007, plaintiff returned to Community Health with complaints of sore throat, loss of voice, and ear ache. (Tr. 315). Physical examination revealed that she moved all of her extremities without difficulty. (Id.) She was diagnosed with bronchitis. (Id.) She returned the following day, and the same findings were noted. (Tr. 316). Plaintiff returned on November 28, 2007 for "medications change," and complained of a cough. (Tr. 317). She noted that she was having more outbursts. (Id.) On

---

[2]Prozac, or Fluoxetine, is used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a689006.html

February 25, 2008, she reported fever, aches and pains, ear pain, sneezing, runny nose/congestion, and productive cough. (Tr. 318). She was diagnosed with influenza. (Id.)

In a Function Report dated January 10, 2008, plaintiff reported that she was able to do laundry, make beds/change sheets, vacuum/sweep, take out trash, and garden. (Tr. 249). She indicated that she could shop for about two and one-half hours or more. (Id.) She indicated that she could watch a two-hour movie but would shake her leg and rock. (Tr. 250). She wrote that she read "books, newspapers, magazines, etc" but could only read for a few minutes. (Id.)

Plaintiff returned to Community Health on March 20, 2008 for medication change and a diabetes test. (Tr. 370). She was alert, active, and in no acute distress. (Id.) She was given Cymbalta.[3] (Id.)

On March 27, 2008, Clinical Psychologist David Lutz, Ph.D., completed a Consultative Examination Report. (Tr. 338-48). Plaintiff reported mood swings and trouble staying focused. (Tr. 343). She reported that she was an average student, attended special education classes, and primarily earned grades of A and B. (Tr. 344). She reported that she was suspended from school on several occasions for cursing at teachers, fighting, and leaving class. (Id.) She reported that she had previously used illicit

---

[3]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

drugs, including marijuana, cocaine, and methamphetamine, but not recently.  (Id.)  Plaintiff reported that she was taking Cymbalta. (Id.)  She reported back problems and migraine headaches.  (Tr. 344).

Dr. Lutz noted that plaintiff was cooperative, responsive and sufficiently pleasant, but seemed to have little energy or motivation.  (Tr. 345).  Dr. Lutz also noted that it seemed likely that it would take little to irritate plaintiff.  (Id.)  Dr. Lutz administered the Wechsler Adult Intelligence Scale test (also "WAIS-III").  (Tr. 346).  Plaintiff's verbal I.Q. score was 70 (borderline range); her performance I.Q. was 80 (low average range), and her full scale I.Q. was 74 (borderline range).  (Id.) Her verbal comprehension was in the borderline range; her perceptual organization was in the low average range; and her working memory was in the extremely low range.  (Id.)  Dr. Lutz opined that plaintiff had borderline intellectual functioning, and that plaintiff's Global Assessment of Functioning ("GAF") score was 65, indicating mild symptoms.  (Tr. 348).  Dr. Lutz opined that plaintiff seemed to be able to understand and remember simple and possibly some moderately complex instructions, but would have trouble with complex instructions.  (Id.)  He opined that plaintiff seemed able to sustain concentration and persistence on simple tasks, but would have difficulty with moderately complex and complex tasks.  (Id.)  He opined that plaintiff seemed able to interact in limited to possibly some moderately demanding social situations, and seemed able to adapt to her environment.  (Id.)

-12-

Plaintiff returned to Community Health on March 28, 2008 for medications and a repeat blood glucose test, and complained of mood swings. (Tr. 369). She was in no acute distress. (Id.) She returned on April 2, 2008 with complaints of right ankle pain after a fall. (Tr. 367). X-ray revealed no fracture. (Id.) Plaintiff was given an over-the-counter analgesic. (Id.)

On April 2, 2008, David Spence, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 349-52). Dr. Spence opined that plaintiff was "moderately limited" in her ability to respond appropriately to changes in work setting; complete a normal workday and workweek without interruptions from symptoms and to perform at a consistent pace without unusually frequent or long rest periods; maintain attention and concentration for extended periods; and to understand, remember, and carry out detailed instructions. (Tr. 349-50). Dr. Spence opined that plaintiff was "not significantly limited" in all other areas. (Id.) He found no areas of marked limitation. (Id.)

Plaintiff returned to Community Health on April 8, 2008 for testing for hyperglycemia and follow-up related to depression. (Tr. 366). She reported that she was feeling much better and wanted to try counseling to help with depression. (Id.) It was noted that her Cymbalta dosage would be increased if she reported continuing problems with anger outbursts. (Id.) She returned on April 17, 2008 and requested an increase in her Cymbalta dosage and prenatal vitamins. (Tr. 365). She reported having problems with outbursts of anger. (Id.)

-13-

Records from Mid-South Health Systems indicates that plaintiff was seen in February and March of 2009, stating that she wanted to talk to someone to vent her anger so that she did not have to vent it on someone else. (Tr. 377-380).

Records from Jefferson Regional Medical Clinic indicate that plaintiff was seen on December 13, 2010 with complaints of severe abdominal pain. (Tr. 390, 407-08). She specifically denied back pain. (Tr. 407). CT scan revealed a cyst in her pelvis, but no other problems. (Tr. 390, 407-08). Physical examination revealed that plaintiff was in moderate to severe pain distress. (Tr. 408). Musculoskeletal examination was negative, and psychiatric examination revealed an appropriate mood and affect. (Id.) She was given antibiotics and prescription pain medication to take as needed. (Tr. 390).

### III.    The Commissioner's Final Decision

A.    The ALJ's Decision

The ALJ determined that plaintiff had the severe impairments of mood disorder, anxiety, adjustment disorder, and ADHD, but did not have a mental impairment or combination of impairments that met or medically equaled a listed impairment, including listings 12.04, 12.05, and 12.06. (Tr. 15-16). The ALJ determined that plaintiff retained the residual functional capacity (also "RFC") "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she has borderline IQ but can do simple, unskilled or low, semi-skilled work; understand, remember and follow concrete instructions; meet,

-14-

greet, give simple instruction and directions, and contact with
supervisors, co-workers and public is superficial." (Tr. 17).

      The ALJ determined that plaintiff was capable of
performing her past relevant work of housekeeper. (Tr. 20). The
ALJ concluded that plaintiff was not under a disability as defined
in the Act at any time through the date of the decision. (Tr. 21).

    B.   <u>The Appeals Council's Decision</u>

      The Appeals Council adopted the ALJ's statements
regarding, <u>inter</u> <u>alia</u>, the issues in the case, the evidentiary
facts, and his findings or conclusions regarding whether plaintiff
was disabled. (Tr. 4-5). These findings by the ALJ are therefore
part of the Commissioner's final decision. <u>See</u> <u>Mitchell v.</u>
<u>Shalala</u>, 48 F.3d 1039, 1040 (8th Cir. 2005) ("The Appeals Council
adopted the ALJ's ruling in June of 1992, making it the Secretary's
final decision.")

      The Appeals Council expressly rejected the ALJ's findings
regarding plaintiff's ability to return to her past relevant work
as a housekeeper. The Appeals Council noted that, to be properly
considered past relevant work, a job must have been performed
within the past fifteen years; it must have been performed long
enough for the claimant to learn the work; and the earnings must
rise to the level of substantial gainful activity for the years in
which the claimant performed the work. (Tr. 5). The Appeals
Council noted that, over the nine-month period plaintiff worked as
a housekeeper, her earnings equated to approximately $518.00 per
month, an amount less than the substantial gainful activity level

-15-

for the years 2005 and 2006.  (<u>Id.</u>)  The Appeals Council concluded
that plaintiff's prior employment therefore failed to satisfy the
requirements for past relevant work, and that plaintiff "did not
have any past relevant work and it is necessary to proceed to step
5 of the sequential evaluation process."  (<u>Id.</u>)

> The Appeals Council then wrote:
>
> The claimant is 28 years old, which is defined
> as a younger individual, who has a limited or
> less education **and who has past relevant work
> that is of an unskilled nature**.  An individual
> with these vocational factors and the residual
> functional capacity to perform work at all
> exertional levels with nonexertional mental
> limitations is found to be not disabled within
> the framework of section 204.00 of 20 CFR Part
> 404, Subpart P, Appendix 2.  At the hearing, a
> vocational expert testified that you could
> perform the jobs of a hand packager and a
> housekeeper.  Reference to the Dictionary of
> Occupational Titles (DOT) shows that the job
> of a hand packager is unskilled and performed
> at the medium level (DOT # 920.687-014) and
> the job of a housekeeper is unskilled and
> performed at the light level (DOT# 323.687-
> 014).
>
> (<u>Id.</u>) (emphasis added).

Later in its decision, in a series of enumerated
findings, the Appeals Council determined that plaintiff "**has no
past relevant work**."  (Tr. 6) (emphasis added).  The Appeals
Council then determined, in the following enumerated finding, that
plaintiff was defined as a younger individual and had a limited or
less education, and that her "**past relevant work is unskilled**."
(<u>Id.</u>) (emphasis added).  The Appeals Council concluded that
plaintiff was not disabled, as defined in the Act, at any time

-16-

through the date of the ALJ's decision.   (Id.)

## IV.   Discussion

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is presently engaged in substantial gainful activity.  If so, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is

-17-

equivalent to a listed impairment, she is conclusively disabled.
At the fourth step, the Commissioner determines whether the
claimant can perform her past relevant work.  If so, the claimant
is not disabled.

If the Commissioner determines, at step four, that the
claimant cannot perform her past relevant work, the sequential
evaluation process continues to step five, where the burden shifts
to the Commissioner to show that the claimant is capable of
performing other work.  Pate-Fires v. Astrue, 564 F.3d 935, 942
(8th Cir. 2009); see also Steed v. Astrue, 524 F.3d 872, 874 n. 3
(8th Cir. 2008) (through step four, the claimant bears the burden
of showing that she is disabled.  After the analysis reaches step
five, however, "the burden shift[s] to the Commissioner to show
that there are other jobs in the economy that [the] claimant can
perform.") Step five requires the Commissioner to consider the
claimant's residual functional capacity and vocational factors such
as age, education, and work experience to determine whether the
claimant can make an adjustment to other work.   20 C.F.R. §§
404.1520(a)(4)(v);  416.920(a)(4)(v).   If the Commissioner
determines that plaintiff cannot perform other work, the claimant
is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it
is supported by substantial evidence on the record as a whole.  42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);
Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial
evidence is less than a preponderance, but enough that a reasonable

-18-

person would find adequate to support the conclusion.  Johnson v.
Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  To determine whether
evidence is substantial, this Court considers "evidence that
detracts from the Commissioner's decision as well as evidence that
supports it."  McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir.
2000).  This Court is not permitted to reverse "merely because
substantial evidence also exists that would support a contrary
outcome, or because we would have decided the case differently.
Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003)
(quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir.  2001)); see
also Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992)
(internal quotation marks and citation omitted) ("if there is
substantial evidence on the record as a whole, we must affirm the
administrative decision, even if the record could also have
supported an opposite decision").

        In the case at bar, plaintiff claims the Commissioner's
decision is not supported by substantial evidence on the record as
a whole.  In support, plaintiff claims that the Commissioner
erroneously assessed her credibility, and erroneously determined
that she did not meet Listing 12.05(c).  Plaintiff also challenges
the Commissioner's step five findings, claiming that they were
based on an insufficient hypothetical question posed to the VE.  In
response, the Commissioner contends that the decision is supported
by substantial evidence on the record as a whole.

    A.   Credibility Determination

        In determining the credibility of a claimant's subjective

-19-

complaints, the Commissioner must consider all evidence relating to those complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). "If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, plaintiff argues that her mental state should have been more fully considered, and that her daily activities were improperly considered. In its decision, the Appeals Council wrote that it was adopting the ALJ's findings regarding the issues in the case, the evidentiary facts, and the findings or conclusions regarding whether plaintiff was disabled. Neither party argues that the Appeals Council did not adopt the ALJ's credibility findings. As such, the undersigned will consider

-20-

the ALJ's credibility determination to have been adopted by the Appeals Council and made part of the Commissioner's final decision.

In evaluating plaintiff's credibility, the Commissioner wrote that he had considered plaintiff's subjective allegations in accordance with <u>Polaski</u> and with 20 C.F.R. §§ 404.1529 and 416.929 and certain Social Security Rulings.  The Commissioner then set forth numerous inconsistencies in the record detracting from the credibility of plaintiff's subjective complaints.

Plaintiff suggests that the Commissioner should have more fully considered her mental state in making his credibility determination.  In support, plaintiff notes that questioning of inarticulate claimants or claimants with limited education is likely to elicit inaccurate testimony.  However, before beginning the administrative hearing, the ALJ explained the hearing procedure to plaintiff and asked her whether she understood, and plaintiff replied in the affirmative.  (Tr. 26).  Consistent with this, review of the questions posed to plaintiff and her responses thereto reflect that she understood the questions and was providing coherent responses.  Plaintiff did not ask to have questions repeated, she did not seek clarification regarding the meaning of questions, and the answers she gave were responsive and logically related to the questions asked.  Plaintiff does not note, nor does review of the hearing transcript reveal, any questioning or testimony tending to suggest that plaintiff had any difficulty understanding questions or providing coherent answers.  There is no basis to conclude that the ALJ should have in any way mitigated his

-21-

consideration of plaintiff's hearing testimony.

Plaintiff also complains that the Commissioner improperly considered her daily activities in discrediting her subjective complaints. In support, plaintiff contends that there is nothing indicating the extent to which her daily activities would be compatible with work activity, that her work record indicated that her mental condition kept her from holding down a job, and that she only worked for brief periods. As the Eighth Circuit has recognized, there are some "mixed signals" regarding the significance of a claimant's daily activities in evaluating claims of disabling pain. <u>Clevenger v. Social Sec. Admin.</u>, 567 F.3d 971, 976 (8th Cir. 2009). However, it is well-settled that an ALJ may properly consider daily activities as one factor in evaluating the credibility of a claimant's subjective complaints. <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007). This is what the ALJ did in this case: he considered plaintiff's daily activities as one factor in analyzing the credibility of her subjective allegations.

In his decision, the ALJ acknowledged his duty to consider plaintiff's subjective allegations in accordance with <u>Polaski</u>, and with 20 C.F.R. §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p, the regulations and social security rulings corresponding with <u>Polaski</u> and credibility determination. The ALJ then reviewed the evidence of record and fully explained his reasoning in concluding that plaintiff's subjective allegations were not entirely credible. The ALJ noted that plaintiff was able to attend to her own personal needs, care for her young daughter,

-22-

complete some housework, garden, shop, prepare simple meals, watch television, watch a two-hour movie, read books, newspapers and magazines, complete puzzles, play video games, and use a computer. Activities such as those considered in the case at bar have been observed to be inconsistent with allegations of total disability. Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007) (affirming the ALJ's finding that daily activities including shopping, performing housework such as cooking, cleaning and washing dishes, caring for personal needs, and caring for children were inconsistent with allegations of total disability).

Plaintiff also contends that her work record indicated that her mental condition prevented her from holding down a job. However, in her Disability Report, plaintiff stated that she stopped working due to her pregnancy. (Tr. 236). The fact that plaintiff stated that she left work for reasons other than a condition she now claims is disabling detracts from the credibility of her subjective allegations. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (claimant stopped working because she was fired, not because of an impairment); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (claimant left his job because the job ended; therefore, not unreasonable for the ALJ to find that this suggested that his impairments were not as severe as he alleged); Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (claimant testified that she stopped working due to a lack of transportation, not due to an impairment). Also, plaintiff's earnings record reflects a sporadic work history even prior to her alleged onset

date.   (Tr. 126-27).   While not dispositive, this raises the
question of whether her continued unemployment is actually related
to her alleged impairments or is more a matter of her own choice.

        The ALJ noted that, despite plaintiff's testimony that
she suffered from severe back pain on a daily basis, there was no
medical evidence indicating any kind of back impairment.   While the
absence of objective medical evidence to support the degree of
alleged symptoms is not dispositive, it is a relevant factor in
credibility determination, and may be properly considered.   See
Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski, 739
F.2d at 1321-22.   Indeed, the medical information of record
reflects that plaintiff sought medical treatment for back
complaints on only one occasion.   Claims of disabling pain may be
discredited when the record reflects minimal or conservative
medical treatment.  See Barrett v. Shalala, 38 F.3d 1019, 1023 (8th
Cir. 1994) (minimal treatment of back pain and migraine headaches
was inconsistent with claims of disabling pain).   The record also
reflects that plaintiff specifically denied back pain when she
presented to Jefferson Regional Medical Center in December 2010.
See Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per
curiam) (discrediting later allegations of back pain when no
complaints made about such pain while receiving other treatment).
Finally, plaintiff testified that she takes no prescription pain
medication, and instead takes only an occasional aspirin.   Where,
as here, there is no attempt to explain plaintiff's reliance upon
only over-the-counter pain medication, her use of only occasional

-24-

aspirin to manage her allegedly disabling back pain belies her
allegations of debilitating pain.  See Harris v. Barnhart, 356 F.3d
926, 930 (8th Cir. 2004).  The evidence of record is inconsistent
with plaintiff's testimony that she suffered from disabling back
pain all day, every day.

Having considered the Commissioner's adverse credibility
determination with the requisite deference, on the claims that
plaintiff raises, the undersigned concludes that it is supported by
substantial evidence on the record as a whole.  The ALJ thoroughly
explained his decision-making process in discrediting plaintiff's
subjective allegations of disabling symptoms, and gave good reasons
for finding plaintiff less than fully credible.  See Juszczyk, 542
F.3d at 632 ("If an ALJ explicitly discredits the claimant's
testimony and gives good reason for doing so, we will normally
defer to the ALJ's credibility determination").

B.    Listing 12.05(c)

Plaintiff did not claim mental retardation in her
applications for benefits or at the administrative hearing as a
basis for a finding of disability.  Even so, the ALJ in this case
wrote that he had considered whether plaintiff met the requirements
for a finding of disability under Listing 12.05(C), explained his
decision-making process, and concluded that plaintiff did not meet
the requirements for a finding of disability under Listing
12.05(C).  (Tr. 16-17).  Plaintiff now challenges this
determination, arguing that a March 2008 I.Q. test administered by
Dr. Lutz yielded a verbal I.Q. score of 70, which meets the first

-25-

prong of subsection C, and that her mood disorder, anxiety, adjustment disorder and ADHD impose additional and significant work-related limitations of function that meet the second prong. Plaintiff also contends that the ALJ made materially inconsistent statements when he initially wrote that plaintiff lacked a valid verbal, performance or full scale I.Q. score of 60 through 70 but later wrote that plaintiff had a verbal I.Q. score of 70. In response, the Commissioner acknowledges that a valid verbal I.Q. score of 70 meets the paragraph C criteria, but that the ALJ implicitly rejected plaintiff's I.Q. score of 70 as invalid. The Commissioner also contends that the ALJ was not obliged to investigate this claim because plaintiff failed to present it in her applications or during the hearing; that plaintiff's diagnosis of borderline I.Q. is inconsistent with a finding of disability based upon mental retardation; that the ALJ was not required to accept I.Q. scores that are inconsistent with the record; and that plaintiff specifically stated that she was not disabled before age 22, a mandatory requirement for a finding of disability under Listing 12.05. Having reviewed the ALJ's decision, the undersigned determines that plaintiff's argument regarding the ALJ's inconsistent statements is well taken.

As the Commissioner correctly notes, plaintiff neither claimed mental retardation in her applications nor raised it during her administrative hearing. Nevertheless, the ALJ wrote that he had considered whether plaintiff met Listing 12.05(C) and described the manner in which he reached his decision that plaintiff did not

meet the requirements thereof.  That decision was made part of the Commissioner's final decision, which plaintiff is entitled to challenge here under 42 U.S.C. § 405(g).

Listing 12.05, the listing for mental retardation, defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05 (2006). The requirements of this introductory paragraph are mandatory. Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).  Listing 12.05 also contains four sets of criteria, set forth in paragraphs A through D.  If a claimant's impairment satisfies the requirements of the introductory paragraph and any one of the four sets of criteria, the Commissioner will determine that the listing has been met.  Id. (internal citation omitted).

In the case at bar, plaintiff challenges the ALJ's decision that she failed to satisfy the paragraph C criteria, which requires her to demonstrate "[a] valid verbal, performance, **or** full scale I.Q. of 60 through 70 **and** a physical or other mental impairment imposing additional and significant work-related limitation of function."  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05(C) (2006)(emphasis added).

In his decision, the ALJ specifically addressed paragraph C of Listing 12.05 and, in concluding that plaintiff failed to meet the necessary criteria, wrote:

-27-

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The claimant's verbal IQ score is 70, performance IQ score is 81, and full scale IQ is 74.
>
> (Tr. 17).

As plaintiff contends, the ALJ made materially inconsistent statements in concluding that plaintiff lacked an I.Q. score that would satisfy the first prong of paragraph C. As quoted above, the ALJ initially wrote that plaintiff did not have a "valid verbal, performance, or full scale IQ of 60 through 70" but then, in the very next sentence, wrote that plaintiff's "verbal IQ score **is** 70." (<u>Id.</u>) The Commissioner acknowledges that such a score would satisfy the paragraph C criteria, but argues that the ALJ's decision can be read to conclude that he implicitly determined that plaintiff's I.Q. scores were not valid. However, the ALJ's decision contains nothing which would allow the conclusion that the ALJ explicitly or implicitly rejected any of plaintiff's I.Q. scores as invalid. The ALJ specifically wrote that plaintiff's "verbal IQ score **is** 70" (Tr. 17) (emphasis added) without giving any indication that he had considered the validity of any of the scores. The lack of any discussion as to the validity of the I.Q. scores combined with the ALJ's use of the present tense in describing plaintiff's verbal I.Q. score of 70 suggests more that he was accepting the score rather than rejecting it, which is

-28-

entirely inconsistent with his prior observation that plaintiff did
not satisfy the paragraph C criteria because she lacked such a
score.  Illogical or erroneous statements that bear materially upon
an ALJ's ultimate decision undermines confidence in that decision.
See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

The Commissioner also contends that plaintiff could not
meet Listing 12.05 because she failed to demonstrate the mandatory
requirement of onset of mental retardation before age 22, and even
specifically denied that she was disabled before age 22.  Indeed,
the requirement of onset before age 22 is mandatory for a
determination that a claimant meets Listing 12.05.  Maresh, 438
F.3d at 899.  However, the ALJ's decision fails to specifically
address the onset issue, and it contains no language that would
permit the conclusion that the ALJ indeed considered and rejected
it.  It is therefore unclear whether the ALJ considered whether
plaintiff met the onset requirement and rejected it, or whether he
failed to consider it at all.  The ALJ's failure to address this
issue is especially glaring in light of the inconsistent statements
described above.

Simply put, the ALJ's conflicting statements create too
much confusion regarding what evidence the ALJ relied upon in
determining that plaintiff failed to meet the paragraph C criteria.
While the undersigned is not determining that plaintiff meets the
12.05 introductory paragraph requirements or the paragraph C
requirements, or that her I.Q. scores were valid and consistent
with the evidence of record, the undersigned cannot conclude that

-29-

the record contains substantial evidence to support the ALJ's
decision that plaintiff did not meet Listing 12.05(C).

     C.    <u>Step Five Findings</u>

         Plaintiff also contends that the Commissioner erroneously
relied upon vocational expert testimony in determining that she was
not disabled at step five.  In support, plaintiff argues that the
ALJ's hypothetical question assumed an individual able to perform
simple unskilled to low semiskilled activities, and who could
understand, follow and remember concrete instructions and have
superficial contact with the public.  Plaintiff contends that these
activities are inconsistent with her testimony that she was easily
distracted and frustrated.  In response, the Commissioner contends
that the ALJ properly assessed plaintiff's credibility, and
included in his hypothetical question only those limitations he
found credible and supported by the record.

         As noted above, the Appeals Council granted plaintiff's
request for review in this case because it disagreed with the ALJ's
determination that plaintiff could return to her past relevant
work.  In so determining, the Appeals Council wrote that
plaintiff's "prior employment does not satisfy the requirements for
past relevant work" inasmuch as it was not performed at the
substantial gainful activity level as required by the Regulations.
(Tr. 5).  The Appeals Council wrote that it had determined that
plaintiff did not have any past relevant work, and that it was
therefore necessary to proceed to step five of the sequential
evaluation process.  (<u>Id.</u>)  The Appeals Council then acknowledged

-30-

the burden shift at step five, and continued in its decision to make its step five findings.  However, as quoted above, in making its step five findings, even though the Appeals Council had just determined that plaintiff did "not have any past relevant work," it wrote that it had considered the fact that plaintiff had "past relevant work that is of an unskilled nature." (Id.)  Later in its decision, in its enumerated findings, the Appeals Council again wrote that plaintiff had "no past relevant work" but then wrote that her "past relevant work is unskilled." (Tr. 6).

The term "past relevant work" is a term of art in Social Security Disability cases.  It is specifically defined in the Commissioner's Regulations at 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1), entitled "Definition of past relevant work."  That definition reads as follows: "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." Id.; see also Mueller v. Astrue, 561 F.3d 837, 841 (8th Cir. 2009) (recognizing the Regulations' definition of past relevant work). Significant is the fact that the ALJ's erroneous determination that plaintiff had past relevant work and could return to it was the reason the Appeals Council granted plaintiff's request for review; it was the basis for the Appeals Council's rejection of the ALJ's step four conclusion; and it was the reason the Appeals Council continued the sequential evaluation process to step five. Moreover, the Appeals Council made no attempt to describe the "past relevant work" it was considering in making its step five findings,

-31-

leaving it unclear exactly what activity the Appeals Council considered in reaching its conclusion.

As noted above, at step five, the Commissioner considers the vocational factors of age, education and "work experience."  20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v).  It is possible that, when the Appeals Council used the term "past relevant work" in making its step five findings, what it was actually referring to was the vocational factor of "work experience" as provided in the Regulations.  However, this would be equally incongruous with the Appeals Council's determination that plaintiff's past work could not be considered "past relevant work" because she did not perform it at the substantial gainful activity level as the Regulations require.  The Regulations define "work experience" in a manner similar to "past relevant work."  See 20 C.F.R. §§ 404.1565(a), 416.965(a).  The Regulations provide that "Work experience means skills and abilities you have acquired through work you have done which show the type of work you may be expected to do.  . . .  We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, **and was substantial gainful activity**."  Id. (emphasis added).  The Appeals Council had specifically determined that plaintiff did not perform her prior work at the substantial gainful activity level.  The Appeals Council's decision does not explain how any of the work plaintiff had performed could qualify as either "past relevant work" or "work experience" as those terms are defined by the Commissioner's Regulations.  It is therefore entirely unclear what

-32-

activity the Appeals Council considered in making its step five findings.

The Appeals Council's findings are inconsistent and irreconcilable. These inconsistencies cannot be dismissed as mere errors in opinion writing. See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987) (a deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding when it probably had no practical effect on the outcome of the case). In this case, the Appeals Council's inconsistent consideration of plaintiff's past relevant work bears materially upon the conclusion it reached at step five. It therefore cannot be said that the Commissioner's step five findings are supported by substantial evidence on the record as a whole. See Sarchet, 78 F.3d at 307 (illogical or erroneous statements that bear materially upon an ALJ's ultimate decision undermines confidence in that decision). Having found the step five findings deficient on this basis, the undersigned declines to continue to consider plaintiff's argument that the step five findings were deficient because the ALJ posed an insufficient hypothetical question to the VE.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed, and this cause is remanded to the Commissioner for proceedings consistent with this Memorandum and Order.

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of September, 2012.